SEALED

Case 2:18-sw-00511-EFB   Document 1   Filed 06/13/18   Page 1 of 11

FILED
JUN 13 2018
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

1  McGREGOR W. SCOTT
   United States Attorney
2  ROBERT J. ARTUZ
   Special Assistant U.S. Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11 | IN THE MATTER OF THE APPLICATION         CASE NO. 2:18-SW-511-EFB
   | OF THE UNITED STATES OF AMERICA
12 | FOR AN ORDER PURSUANT TO § 2703(d)
   | RE: EMAIL ACCOUNTS IDENTIFIED BY         APPLICATION
13 | BTSPRESENTS@GMAIL.COM AND
14 | SACLIVEPRESENTS@GMAIL.COM                **UNDER SEAL**

15

16                  I.    **APPLICATION**

17     The United States of America, moving by and through its undersigned counsel, respectfully

18 submits under seal this ex parte application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed

19 Order would require Google LLC, an Internet service provider located at 1600 Amphitheatre Parkway in

20 Mountain View, California, to disclose certain records and other information pertaining to the EMAIL

21 ACCOUNTS identified by BTSPRESENTS@GMAIL.COM AND

22 SACLIVEPRESENTS@GMAIL.COM as described in Part I of Attachment A. The records and other

23 information to be disclosed are described in Part II of Attachment A to the proposed Order. In support

24 of this application, the United States asserts:

25                  II.   **LEGAL BACKGROUND**

26     1.     Google LLC is a provider of an electronic communications service, as defined in 18

27 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly,

28 the United States may use a court order issued under § 2703(d) to require Google LLC to disclose the

items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.  This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). *See* 18 U.S.C. § 2711(3)(A)(ii).

3.  A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

### III. RELEVANT FACTS

#### Introduction

4.  The United States is investigating a conspiracy and scheme involving former Social Security Administration (SSA) employee Eric Lemoyne Willis and subjects Darron Ross and Joshua George. Particularly, the United States is investigating acts including Willis using his official position at SSA to gather the personally identifiable information of Social Security beneficiaries and using that information to unlawfully redirect the SSA benefits of at least 129 victims to fraudulently created bank accounts controlled by him and possible coconspirators Ross and George. The investigation concerns possible violations of, inter alia, 18 U.S.C. § 371 [conspiracy], 18 U.S.C. § 641 [theft of government property], 18 U.S.C. § 1028A [aggravated identity theft], 18 U.S.C. § 1343 [wire fraud], and 42 U.S.C. § 408 [Social Security fraud].

#### Eric Willis

5.  SSA terminated Willis from employment on January 5, 2018. At the time of his termination, Willis was an Operations Supervisor at the SSA field office in Lodi, California where he worked from February 7, 2016 to the date of his termination. Prior to his reassignment to the Lodi

office, Willis was an Operations Supervisor at SSA's South Sacramento field office. Willis started working for SSA in 2003.

6. As of May 25, 2018, the United States has identified 129 Social Security retirement beneficiaries whose benefits were fraudulently diverted to other bank accounts ("drop accounts") and whose SSA records Willis accessed prior to each fraudulent change. After Willis queried a given victim, an unidentified individual then made a phone call to an SSA field office somewhere in the U.S., used the victim's personally identifiable information to impersonate the victim to an SSA employee, and then successfully changed the victim's direct deposit to a drop account. SSA then paid the victim's next Social Security payment to the drop account. In most cases, the victim contacted SSA after the first missing Social Security payment. However, in some cases the victim did not contact SSA for several months or more.

7. SSA records show Willis used his SSA computer to access reports for each one of these 129 victims prior to the fraudulent direct deposit change. For approximately 33% of the victims, the fraudulent direct deposit change was made within 30 days of Willis accessing their SSA records, approximately 75% of the direct deposit changes were made within 90 days, and approximately 98% were made within 180 days. The first known victim's direct deposit information was fraudulently changed on December 3, 2015. The most recent known victim's direct deposit was fraudulently changed on May 2, 2018. The estimated theft loss for the 129 known victims is at least $393,000.

8. The United States has identified no reasonable explanation for the correlation between Willis's query of a given Social Security Number and the fraudulent direct deposit change that follows shortly thereafter. Since Willis worked in an SSA field office whose primary role is to serve the public within its geographic area of responsibility, it is notable that approximately 58% of the victims resided outside of the geographic service areas for the Lodi and South Sacramento SSA offices where Willis worked. More significantly, approximately 24% of the victims resided outside of the state of California entirely.

9. T-Mobile records state that Willis is the current subscriber for phone number 916-710-3366 with service effective April 4, 2017.

APPLICATION 3

10. Sprint records state that Willis was the subscriber for phone number 916-710-3366 with service from December 9, 2014 to April 4, 2017.

11. According to AT&T U-Verse subscriber information, Willis subscribed to U-Verse home internet service. That subscriber information show the following information associated with Willis: Account Id = 144503560; Account Name = ERIC WILLIS; Member Id = btspresents@att.net; and Established = 05/21/2015. That service was provided at the following address: 40 Park City Court, Apartment 11205, Sacramento, California. A Wells Fargo account application in Willis's name and signed by Willis on October 24, 2015 lists the same address as his statement mailing address and street address.

12. Willis's personal network drive ("P-drive") on SSA's computer network contains documents disclosing the following email addresses for Willis: BTSPRESENTS@GMAIL.COM (15 documents modified 12/30/2009 – 02/28/2012) and SACLIVEPRESENTS@GMAIL.COM (4 documents modified 03/11/2013 – 11/01/2013). Willis's SSA work computer also contains documents disclosing the following email addresses for Willis: BTSPRESENTS@GMAIL.COM (listed as an email address in a document dated 6/14/12) and SACLIVEPRESENTS@GMAIL.COM (Internet cookie file lists this email in use as recently as 2/11/16). Willis's SSA work computer also shows that Willis was using his computer to communicate to and from the following email accounts: BTSPRESENTS@GMAIL.COM (59 emails dated within the range of 6/15/11 – 8/30/12) and SACLIVEPRESENTS@GMAIL.COM (18 emails dated within the range of 3/11/13 - 11/24/13).

**Bank Records for Drop Accounts**

13. The Social Security benefits of the 129 beneficiaries were redirected to various drop accounts held at American Express National Bank, Green Dot, and Metabank. All three of these financial institutions offer prepaid debit cards available for purchase in a retail store or online. Many of these prepaid debit cards have the ability to receive direct deposits like a traditional bank account. Furthermore, since the accountholder information is usually provided online, it is easy to provide false accountholder information when setting up the account. These prepaid debit cards are commonly used in direct deposit fraud schemes against SSA.

14. Approximately 43 American Express, Green Dot, and Metabank accounts were used as

drop accounts for the victims' Social Security benefits. The United States has investigated bank records for 10 prepaid debit card accounts associated with approximately 50 victims between March 2016 and January 2018. It appears that the accountholders named on the drop accounts are actually identity theft victims whose identities were used to open the drop accounts without their knowledge. The billing addresses listed on the 10 drop accounts are a variety of Charlotte, North Carolina addresses.

15. Counting debits of at least $50, the money was withdrawn from the 10 drop accounts via approximately 338 transactions, the vast majority of which were cash withdrawals of several hundred dollars each. Approximately 73% of the withdrawals occurred in the Charlotte, North Carolina area, approximately 16% occurred in the southern California area (suggesting a southern California-based coconspirator), and approximately 6% occurred in the Atlanta, Georgia area. The remaining handful of withdrawals occurred in Scottsdale, Arizona and Sandy, Utah.

16. The United States has examined logs of internet protocol (IP) addresses which were used to access the drop accounts via the internet. According to Green Dot records, IP address 76.248.20.51 was used on May 16, 2016 to access a Green Dot drop account ending in 0799. According to AT&T, the related internet service provider, IP address 76.248.20.51 was assigned to Willis's U-Verse home internet account on that date.

17. In addition to the occasion discussed above, there were approximately 255 other occasions where the 10 accounts were accessed via the internet between February 2016 and August 2017. According to publicly available IP lookup tools, the majority of this activity was from IP addresses in the Charlotte, North Carolina area.

18. For two drop accounts, the United States reviewed phone banking logs which recorded details for when the accounts were accessed via phone banking. Phone number 980-256-4502 accessed these accounts via phone banking on October 7, 2016 and October 13, 2016 respectively. According Ross's probation/parole officer, 980-256-4502 was a number that he previously used to communicate with Ross.

### Bank Records for Eric Willis

19. The United States has reviewed bank records for accounts held in Willis's name at Mokelumne Federal Credit Union, Sun Pacific Federal Credit Union, and Wells Fargo. During the

period December 7, 2015 through November 20, 2017, there were 62 deposits into Willis's accounts totaling approximately $74,000 where the source of the funds was not readily identifiable. With the exception of two deposits, all appear to be cash deposits; the two exceptions were wire transfers totaling $5,150 from an account at Compass Bank in Willis's name. Of the 62 deposits, six deposits totaling $10,240 occurred in the Charlotte, North Carolina area and four deposits totaling $8,800 occurred in the San Diego, California area.

### Darron Ross

20. Surveillance footage provided by First Citizens Bank shows an automated teller machine (ATM) withdrawal from the Green Dot account ending in 0799 for $403.00 on June 17, 2017 at a First Citizens Bank drive-thru ATM in Huntersville, North Carolina. In the footage, the person conducting the withdrawal is driving a dark-colored Mercedes-Benz Sprinter van bearing North Carolina plates EH4037. According to a North Carolina vehicle registration search conducted by Customs and Border Protection's National Law Enforcement Communications Center, the vehicle is currently registered to Darron Dimitri Ross, North Carolina driver's license number 38643319. The person conducting the withdrawal appears to match Ross's driver's license photo.

21. According to Green Dot, the debit card associated with the account ending in 1023 was ordered online and shipped to 1604 Oakdale Drive, Charlotte, North Carolina. This account is associated with eight direct deposit fraud victims and there were more than 50 withdrawals using the debit card shipped to this address. LexisNexis Accurint and county records available online associate this address with Ross's aunt, uncle, and cousins.

22. According to Officer Brian Tillack – Probation/Parole Officer, North Carolina Department of Public Safety – Ross is under supervision for probation since February 2018 for identity theft-related offenses from August 2015 and January 2016. Ross was under Officer Tillack's supervision for a previous period which ended in January 2017. Officer Tillack was able to identify Ross in several ATM photos associated with withdrawals at Sun Trust Banks in Charlotte, North Carolina and Atlanta, Georgia from Green Dot account 1023 on March 17, 2017; May 9, 2017; and January 19, 2018.

23. On January 20, 2016, the Police Department of Mooresville, North Carolina, arrested

Ross for credit card fraud. During that arrest, Mooresville PD seized a Wells Fargo Bank transaction receipt found in Ross's possession, which shows a $4,000 cash deposit into a Wells Fargo bank account ending in 8228. The deposit occurred at 12:51 PM on January 30, 2016, several hours prior to Mooresville PD's arrest of Ross. The United States has determined that the Wells Fargo account ending in 8228 was held by Willis at the time of the deposit.

24. Officer Tillack further disclosed that phone number 980-254-1979 was used to contact Ross from November of 2016 to at least January 2017. Additionally, Accurint associates 980-254-1979 with Ross for the dates November 2014 to May 2018. Officer Tillack also disclosed that Ross switched to using phone number 704-430-4344 to communicate in early 2018. That number is associated with an AT&T wireless account.

25. T-Mobile toll records for the period April 2017 to February 2018 show 113 calls between Willis's phone number 916-710-3366 and Ross's phone number 980-254-1979.

### Joshua George

26. According to bank records for four drop accounts (three Metabank and one Green Dot), approximately 56 cash withdrawals totaling approximately $17,695.25 were conducted in southern California between August 19, 2016 and December 8, 2017. Of these transactions, 44 were conducted in the San Diego area, 7 were in the Orange County area, and 5 were the Los Angeles area.

27. One of the Green Dot drop accounts discussed above – account ending in 0799 – was accessed via the internet from IP address 76.238.229.143 on October 22, 2016 and January 10, 2017. According to AT&T U-Verse records, IP address 76.238.229.143 was assigned to subscriber Joshua George on the dates the Green Dot account was accessed online. AT&T U-Verse subscriber information lists George's email as jae1683@yahoo.com, and the service and billing addresses as 5430 Santa Sofia, San Diego, CA. That subscriber information also shows the following information associated with George: Account Id = 134920240; Account Name = JOSHUA GEORGE; Member Id = joshua9657@att.net; and Established = 04/11/2014. The service was provided at the following address: 5430 Santa Sofia, San Diego, California.

28. A March 2, 2018 application for CBP's Global Entry program lists the following information for Joshua Bilal George: cell phone 916-807-0027; email jae1683@yahoo.com; home

address 5430 Santa Sofia, San Diego, CA. Additionally, according to the City of San Diego's Active Business Listing available online, George is the sole owner of JBG Supply, an electronic shopping and mail-order company registered to 5430 Santa Sofia, San Diego, CA. Additional information listed includes phone number 916-807-0027. Additionally, Accurint associates phone number 916-807-0027 with George from November 1996 to May 2018.

29. T-Mobile toll records show 177 phone calls between Willis (916-710-3366) and George (916-807-0027) between April 22, 2017 and February 26, 2018.

**Willis's Google Account Records Are Relevant and Material to the Investigation**

30. As discussed above, the following Google email accounts are associated with and have been used by Willis: BTSPRESENTS@GMAIL.COM AND SACLIVEPRESENTS@GMAIL.COM (the "Accounts") for electronic communication.

31. There is probable cause to believe Willis and Ross engaged in, and continue to engage in, a conspiracy or scheme to unlawfully divert the Social Security benefits of at least 129 victims, beginning at least as early as November 2016. Given the geographic separation of Willis in California from Ross in North Carolina, the two must use telephonic and electronic means of communication (e.g., email) to coordinate and carry out their scheme, as evidenced, for example, by the 113 call records between Wills and Ross during an approximately 10-month period. It is reasonable to believe that Willis is also communicating with other potential coconspirators over long distances, including but not limited to George. The geographic separation of the coconspirators, and the sheer volume and specificity of the information required to divert the Social Security benefits of at least 129 victims to at least 43 drop accounts, further illustrates the need to use email communication to record and exchange large amounts of information.

32. For example, email is one of the simplest, most readily available means for Willis to exfiltrate Social Security information—such as the personally identifiable information of direct deposit victims—from SSA's networks. Furthermore, email provides a ready means for Willis to coordinate the direct deposit fraud scheme described with geographically distant coconspirators such as Ross.

33. Subscriber records relating to the Accounts will confirm the specific dates that Willis had control over these accounts. Additionally, it is reasonable to believe that records associated with the

Accounts will show the dates, times, and durations that Willis communicated with Ross, George and/or other potential subjects involved in the scheme or conspiracy – whether by email, voice, or other electronic means. Similarly, records showing phone or instrument numbers associated with the Accounts may provide information identifying the specific device(s) that Willis used during relevant communications. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

34. It is reasonable to believe that an identification of the types of Google services utilized will reveal services used in furtherance of the crimes under investigation or services used to communicate with coconspirators. For example, evidence of use of Google Drive, Google Calendar, and Google Hangouts will show whether Willis is regularly using these services. Similarly, information regarding other subscriber numbers or identities may reveal other accounts or email addresses that Willis is using, including other email addresses that Willis is using to communicate with coconspirators.

35. Subscriber IP address information associated with the Accounts will provide identifying information and will be compared to IP addresses used to access and maintain accounts (e.g., drop accounts) connected to fraudulently activity.

36. It is reasonable to believe that subscriber payment and billing records for the Accounts will show bank account or credit card information that will link the Accounts to subjects involved in the scheme or conspiracy including Willis, Ross, and George. Billing record information will also provide evidence of financial accounts that the subscribers may have used for transactions to further the conspiracy or scheme.

37. Records of user activity for each connection made to or from each Account will show information including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination IP addresses the dates, times, data transfer volume. It is reasonable to believe that this information will show or help identify Willis's electronic communications with Ross, George, and/or other potential subjects involved in the scheme or conspiracy, as well as the types and nature of those communications. This information can also be used to identify connections (e.g., Internet sessions) between each Account and internet sites associated with

the above-identified fraudulent activity, including online portals used to monitor one or more of the fraudulent drop accounts. Information about each communication sent or received by each Account will provide similar relevant and material information.

## IV.   GOVERNMENT REQUESTS

38. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, this information will help the United States identify and locate the individual(s) who are responsible for the events described above, and determine the nature and scope of their activities. Accordingly, the United States requests that Google LLC be directed to produce all items described in Part II of Attachment A to the proposed Order.

39. The United States further requests that the Order require Google LLC not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order for 180 days from the date of the order, unless extended. See 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." Id. In this case, such an order would be appropriate because the requested Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the requested Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. See 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

40. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the

investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 11, 2018

McGREGOR W. SCOTT
United States Attorney

By: /s/ Robert J. Artuz
ROBERT J. ARTUZ
Special Assistant United States Attorney